*In re* ESTATE OF DORA WEISBERG, Incompetent.—(HARRY WEISBERG, Petitioner-Appellee, *v.* RUTH BRUCAR *et al.*, Respondents-Appellants.)

First District (2nd Division)   No. 77-1121

Opinion filed June 27, 1978.—Modified on denial of rehearing August 1, 1978.

Philip Z. Levinson and Bernard B. Nathan, both of Chicago, for appellants.

Juron and Rubin, of Chicago (Ira E. Rubin, of counsel), for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Petitioner, Harry Weisberg, conservator of the estate of his mother, Dora Weisberg, instituted citation proceedings under section 183 of the Probate Act (Ill. Rev. Stat. 1975, ch. 3, par. 183) against respondents, Ruth Brucar and Albert Brucar, daughter and son-in-law of the incompetent. Respondents filed an accounting which consisted of alleged expenses

incurred by or on behalf of the incompetent while she resided with respondents. Petitioner objected to certain expenses listed. Upon trial the court found that respondents violated a fiduciary duty owed to the incompetent and ordered respondents to turn over $36,850 and various items of jewelry to petitioner-conservator. Respondents appeal from the order of the trial court.

The issues presented for review are: (1) whether the trial court had jurisdiction to adjudicate rights of property; (2) whether the trial court improperly admitted incompetent evidence; (3) whether necessary parties to the citation proceeding were improperly omitted requiring petitioner to file a supplemental petition; and (4) whether the judgment of the trial court is against the manifest weight of the evidence. We will consider also a motion filed by respondents to assess petitioner-appellee for costs of compiling the excerpts.

On October 18, 1976, Dora Weisberg (hereinafter Dora) was declared to be physically incompetent, and petitioner was appointed conservator of Dora's estate. On November 8, 1976, petitioner was granted leave to file citation proceedings against respondents Ruth Brucar (hereinafter Ruth) and Albert Brucar (hereinafter Albert) to discover where Dora's money was located and to recover any assets belonging to Dora's estate. After respondents refused to turn over certain property allegedly belonging to the estate, petitioner (hereinafter Harry) filed a petition for a rule to show cause why respondents should not be judged in contempt. Respondents answered and filed an accounting which consisted of alleged expenses incurred by and on behalf of the incompetent while she resided with respondents. A trial was held on the issues of the contested items on the accounting, which included the following: a gift of $10,000 made to Wayne Brucar; cash given to Albert; money paid to an attorney, Mr. Ellis; cash given to Dora by respondents; penalties assessed by several banks for early withdrawal of funds; gifts of carpeting and cemetery plots made to respondents; $10,000 paid to Ruth; money spent for medication for Dora; and the whereabouts of jewelry owned by Dora and money received as social security and medicare payments.

The evidence adduced at trial was as follows: In August 1975 Dora's husband, Samuel Weisberg, died, and Dora went to live with her son Harry and his wife, Phyllis Weisberg. At this time Dora had $42,800 which she and her deceased husband had accumulated during their marriage. The money was put into three separate accounts: (1) $30,000 was deposited in a four-year certificate of deposit at Niles Savings and Loan Association in the names of Dora and Phyllis Weisberg as joint tenants; (2) $12,000 was deposited in a two-year certificate of deposit at Skokie Federal Savings and Loan Association in the names of Dora and Phyllis Weisberg as joint tenants; and (3) $800 was deposited in a checking

account at Glenview Trust and Savings Bank in the names of Dora and Harry as joint tenants.

On October 31, 1975, Dora decided to move to the home of Ruth and Albert, her daughter and son-in-law. The certificate of deposit accounts were changed to the names of Dora and Ruth. Phyllis Weisberg's name was deleted. Dora testified that she changed the accounts so that the money would be readily available to her and so that Ruth could withdraw the money in the event she could not get out.

The $30,000 certificate of deposit account at Niles Savings was then closed, and the money was transferred to three separate accounts as follows: (1) $10,000 was deposited at First Federal of Wilmette in the names of Dora and Ruth. This money was withdrawn in early 1976 with a penalty, deposited in a checking account at Bank of Lincolnwood and used to pay bills from the nursing home. (2) $10,000 less penalties was deposited in an account in Ruth's name alone. Ruth testified that in 1968 she had given her father, Samuel Weisberg, $10,000 to help support him, and that the money was being returned to her. Ruth stated that there was no written agreement between her and her father because they were very close. Dora denied that her husband ever received $10,000 from Ruth and stated that the money was part of that which she and her husband had saved during their marriage. (3) $10,000 was deposited at Evanston Federal in the names of Dora and Ruth; the money was subsequently withdrawn on December 19, 1975, and deposited in an account at Northwest Federal in the name of Wayne Brucar as trustee for Ruth. Ruth testified that Dora gave the money to Ruth's son, Wayne Brucar, as a gift to aid him in continuing his education. Dora denied making the gift. The records from Northwest Federal indicated that the account was opened December 19, 1975, and all the money was withdrawn by Wayne from May 28, 1976, to July 1, 1976. Ruth testified that she did not know what Wayne did with the money.

In reference to the two other accounts which Dora had when she went to live with Ruth and Albert, Albert testified that the $12,000 certificate of deposit account at Skokie Federal was transferred to a checking account and used to pay Dora's expenses. The $800 checking account at Glenview Bank was closed, and the money was deposited in one of Dora's other accounts. A total of $1009.24 was assessed as penalties for the early withdrawal of funds from the various accounts, and Harry computed that $5842.31 was lost in interest when Dora's money was withdrawn from the certificate of deposit accounts.

A checking account at Bank of Lincolnwood in the names of Dora and Ruth was used to pay Dora's expenses, several of which were contested by Harry. Fifteen checks for $25 each were made payable to Albert. Dora testified that she had a problem with her bladder, and that when she

would have an accident, Albert would charge her $25 and have Ruth write a check for him. Thereafter, Dora did go into the hospital and have surgery on her bladder. Albert testified that he did charge Dora $25 on several occasions because he was trying to use psychology to get Dora to control herself. Albert stated that he cashed the checks but that he put the money in Dora's purse.

Ruth withdrew $3217 in cash from the checking account. Ruth testified that she gave the money to Dora so that Dora could reimburse Harry for payment of the funeral bill of Samuel Weisberg. Dora testified that she never received any of the money in question and never gave $3000 to Harry. Harry testified that the checking account at Glenview Bank was opened in order to pay the funeral expenses of Samuel Weisberg; that the funeral bill was in fact paid from the account and he did not receive $3000 in cash from Dora as a reimbursement. Harry's receipt for payment of the funeral bill was admitted into evidence.

Ruth wrote two checks, one for $300 and one for $500 to an attorney, Mr. Ellis. Ruth testified that the money was to pay for services rendered on behalf of Dora in a proceeding before Judge Delaney in which Ruth and Albert were charged with kidnapping Dora. Dora testified that she did not engage Mr. Ellis to represent her in a lawsuit before Judge Delaney. Martin Klein, an attorney, testified that he performed services for Dora in a suit instituted by Harry against Ruth and Albert for harassment. Mr. Klein stated that he never requested Mr. Ellis to perform any services, that in fact Mr. Ellis represented Ruth and Albert in that action, and to his knowledge Mr. Ellis never appeared before Judge Delaney on behalf of Dora. Albert testified that he did engage Mr. Ellis to represent him and Ruth, but that Mr. Ellis performed other services for Dora such as drawing a will and representing her in a personal injury action.

Albert testified that a sum of $412.50 was paid for Dora's medication. One receipt for $41.25 was presented to the trial court, and Albert contended that $41.25 was paid each month so that a total of $412.50 was paid while Dora resided with him and Ruth. Dora testified that she did not spend $412.25 on medication, and that at most she would pay about $40 at one time for medicine that would last three months.

A check for $300 was written by Ruth to Milmat Carpet. Ruth testified that Dora had ruined the carpeting in Ruth's home and wished to replace it. Dora testified that she never purchased carpeting as a gift to Ruth and Albert.

A check for $214 was drawn by Ruth and made payable to Shalom Memorial as a down payment for two cemetery plots. Ruth testified that it was her father's desire that all members of the family be buried at the same place, and that while her father was living he purchased cemetery

plots for Harry and his wife. Ruth stated that when she and Dora went to purchase a headstone for her father's grave, Dora also purchased the two cemetery plots and gave them to Ruth and Albert as a gift in order to carry out the father's desire. Dora testified that she never made a gift of the cemetery plots to Ruth and Albert. Harry testified that he owned two plots, but that he purchased them and did not receive them as a gift from his father.

Dora testified that she received $218 every month for social security, and that she received medicare benefits; that she signed the checks, gave them to Ruth, and Ruth deposited the money in a checking account. Dora also stated that Ruth and Albert forced her to sign four blank pieces of paper by threatening to put her in a nursing home. Ruth testified that the checks were cashed and the money was spent by Dora. Records from medicare showed that Dora was paid $403 in benefits during the time she lived with Ruth and Albert. No records of the social security payments nor cancelled checks were offered as evidence.

Dora owned several items of jewelry, including a man's ring, a diamond ring, diamond earrings and a cameo pin. Dora testified that Ruth and Albert took the jewelry from her while she was in the hospital, and they never returned it to her. Ruth testified that the man's ring was given to her by Dora after her father died, but that she has no knowledge of where the other jewelry is now. Ruth and Albert stated that while Dora was in the hospital, hospital personnel took the jewelry and put it in a safe, and that when Dora was released, the jewelry was not returned to Dora. Ruth and Albert insured the diamond ring, valued at $2500, and the diamond earrings, valued at $325, as a rider to their homeowners policy. Ruth and Albert never filed a claim for loss of Dora's jewelry. The cameo pin was not insured, and no evidence was presented as to its value.

Ruth and Albert both testified that they never converted any money belonging to Dora for their own use, and that their relationship with Dora was good. Albert testified that no money belonging to Dora was deposited in his personal checking account, and no jewelry or money belonging to Dora was put in his safe deposit box. Approximately $7000 was turned over to Harry as conservator on January 17, 1977.

On July 7, 1977, the court entered an order finding that respondents did wrongfully violate the trust and fiduciary responsibility owed to the incompetent and did convert assets of the incompetent to their own use. The court ordered respondents to turn over to petitioner, conservator of the estate, the sum of $36,850.55, one man's ring and certain items of jewelry belonging to the incompetent or $4,975.

Respondents initially contend that the trial court did not have jurisdiction to adjudicate rights of property because the citation petition was limited to discovery of information.

■■■ There are two types of citation proceedings, one in the nature of discovery and the other an adversary proceeding in which the right and title to personal property is contested and determined by the court. (Ill. Rev. Stat. 1975, ch. 3, par. 183.) If a citation petition requests only information, the court may not try the question of title and order property to be turned over. (*Radice v. Antonacci* (2d Dist. 1967), 87 Ill. App. 2d 139, 231 N.E.2d 107; *In re Estate of Garrett* (2d Dist. 1967), 81 Ill. App. 2d 141, 224 N.E.2d 654, *appeal after remand* (2d Dist. 1969), 109 Ill. App. 2d 243, 248 N.E.2d 539.) The order must be based upon an issue established in the pleadings so that respondent has an opportunity to know the issues and prepare a defense. (*In re Estate of Garrett.*) In *Garrett* the petition recited that petitioner believed respondent had possession or control of certain personal properties and prayed that the court enter a proper order. The appellate court found that the petition invoked the court's jurisdiction to adjudicate rights to property because the petition was sufficient to inform respondent that petitioner sought recovery, and not just discovery, of property in respondent's control. Other courts have also found that where there is an allegation that certain property belonging to the estate is in the possession of respondents and a request for proper order by the court, the petition sufficiently informs respondents that recovery is sought. Thus, an order requiring respondents to turn over property is based on an issue raised in the pleadings. *In re Estate of McIntire* (5th Dist. 1976), 44 Ill. App. 3d 726, 358 N.E.2d 903; *In re Estate of Baxter* (4th Dist. 1973), 9 Ill. App. 3d 92, 291 N.E.2d 851, *rev'd on other grounds* (1973), 56 Ill. 2d 223, 306 N.E.2d 304.

■■ In the present case the petition recites that petitioner is of the belief that respondents have wrongfully taken property belonging to the incompetent, and that a demand was made for such property. The petition then prays that the court direct respondents to show cause why they should not be judged in contempt for failure to turn over the property, and that the court grant such other relief as it may deem fair and equitable. The petition was sufficient to apprise respondents that petitioner sought recovery of property in their possession and control. Under the holdings in *Garrett, McIntire* and *Baxter,* the petition properly invoked the authority of the court to adjudicate rights of property.

Respondents next contend that most of the testimony admitted at the hearing was irrelevant to the issues and should have been excluded. In their brief respondents make no reference to specific portions of testimony or specific pages in the record. There is only a general statement that most of the testimony in a transcript of over 700 pages should have been excluded.

In citation proceedings brought by the representative of an estate against someone withholding assets claimed by the estate, the rules of

evidence are liberally applied. (*In re Estate of McVicker* (1st Dist. 1963), 39 Ill. App. 2d 389, 188 N.E.2d 731; *In re Estate of Vercillo* (1st Dist. 1960), 27 Ill. App. 2d 151, 169 N.E.2d 364.) The court noted several times during the proceeding in the present case that wide latitude is allowed in citation proceedings, and that the rules of evidence are not strictly followed.

■■■ It has been held that an appellant cannot complain on appeal that the court erred in admitting appellee's evidence where the appellant offered similar evidence which violated the same rule. (*City of Lincoln v. Chicago & Alton R.R. Co.* (1914), 262 Ill. 98, 104 N.E. 282; *People v. Killian* (4th Dist. 1976), 42 Ill. App. 3d 596, 602, 356 N.E.2d 423 (dissenting opinion). See also *Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 356 N.E.2d 13.) The record clearly establishes that both sides were given wide latitude in their direct examination and cross-examination of the witnesses. Although the major part of the testimony attempted to establish what the incompetent's assets were, who had control over them and how the assets were distributed, there were instances when the testimony was irrelevant to the issues. However, the object of the appellate court on review is not to determine whether the record is totally free of error, but to determine whether any error occurred which operated to the prejudice of appellant. (*Needy v. Sparks* (1st Dist. 1977), 51 Ill. App. 3d 350, 366 N.E.2d 327.) The party asserting error must demonstrate to the court that prejudice resulted. (*O'Brien v. Walker* (1st Dist. 1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.) Although an entire record is available, a reviewing court is not required to search the record for the purpose of reversing a judgment. (*Village of Tremont v. Albrecht* (3d Dist. 1976), 44 Ill. App. 3d 373, 358 N.E.2d 362; *Geleto v. Giglietti* (3d Dist. 1976), 40 Ill. App. 3d 226, 352 N.E.2d 1.) Here respondents have not referred in their brief to specific portions of testimony that should have been excluded, and they have not demonstrated that prejudice resulted. The admission of evidence is a matter largely within the discretion of the trial court, and its decision should not be disturbed unless such discretion has clearly been abused. (*Needy v. Sparks.*) The record does not show that the trial court abused its discretion.

Respondents next contend that the court erred in ordering them to turn over the sum of $10,800 because this amount was within the control of third parties who should have been made parties to the proceeding. Specifically, respondents state that $800 was received by Arthur Ellis, and $10,000 was received by Wayne Brucar, and that each recipient was a necessary party to the citation proceeding.

■■ Persons who have possession or control of property alleged to belong to the estate are necessary parties to the citation proceedings. (*In*

*re Estate of Garrett.*) Where it is discovered that property has been transferred to third parties, a supplemental petition may be filed to bring in the necessary parties and to recover the property. *In re Estate of Garrett.*

With reference to the $800 paid to Mr. Ellis, respondent Ruth Brucar testified that the money was paid for services rendered on behalf of Dora by Mr. Ellis in a proceeding held before Judge Delaney in which respondents had been charged with kidnapping Dora. Mr. Klein testified that he represented Dora in that proceeding, that the suit was for harassment by respondents, and that to his knowledge Mr. Ellis never appeared on behalf of Dora in the action. Respondent Albert Brucar testified that Mr. Ellis did represent him and his wife in the action before Judge Delaney, but that Mr. Ellis performed other services for Dora such as writing a will and representing her in a personal injury action.

■■ The evidence was sufficient for the trial court to conclude that the $800 was in payment of services rendered on behalf of respondents and not the incompetent. Although Mr. Ellis received funds from the estate, it is not necessary to make him a party to the proceedings because the money was used by respondents for their own benefit. Respondents cite *In re Estate of Garrett* to support their contention that Mr. Ellis is a necessary party. However, the facts in *Garrett* distinguish that case from the case at hand. In *Garrett* the respondent transferred property of the estate to third parties without receiving any benefit and allegedly according to the wishes of the decedent. Here, respondents received the benefit of the $800, and they should account for such amount to the court. Thus, the trial court's order requiring respondents to turn over the $800 to petitioner was supported by the evidence.

With respect to the $10,000 received by Wayne Brucar, Ruth Brucar testified that Dora gave Wayne the money as a gift so Wayne could continue his education, and that the $10,000 was drawn from an account which was in the names of Ruth and Dora. Dora testified that she never made a gift of $10,000 to Wayne. The bank records show that both Ruth and Dora signed the withdrawal slip and withdrew $10,000 from Evanston Savings and Loan on December 19, 1975; that a check was issued to Wayne Brucar and deposited in an account at Northwest Federal in the name of Wayne Brucar as trustee for Ruth Brucar; and that from May 1, 1976, to July 1, 1976, the entire $10,000 was withdrawn in five cash withdrawals by Wayne, and the account was closed. There was no evidence showing what was subsequently done with the money. Ruth testified that she did not know what Wayne did with the money.

■■ The record shows that $10,000 was withdrawn from Dora's account and deposited in an account in the name of Wayne Brucar as trustee for Ruth Brucar. Although Ruth's name appeared on the account, the record

shows that Wayne alone had control over the account and in fact withdrew all of the money. There is no evidence that Ruth or Albert received any of the $10,000. When property allegedly belonging to the estate is in the possession or control of a person other than the named respondents, that person must be made a party to the citation proceedings. (*In re Estate of Garrett.*) Under *Garrett*, Wayne Brucar was a necessary party and a supplemental petition must be filed against Wayne Brucar.

Respondents next contend that the decision of the trial court requiring them to turn over certain sums to the conservator is against the manifest weight of the evidence. Specifically, respondents' argument concerns several items listed in the accounting which were objected to by petitioner and which the court ordered respondents to return to petitioner.

■■ ■ A finding of the trial court on the issue of whether certain property belonged to the estate will not be disturbed on appeal unless it is against the manifest weight of the evidence. (*Clow v. Chicago Title & Trust Co.* (3d Dist. 1972), 9 Ill. App. 3d 168, 292 N.E.2d 44.) Initially it will be noted that the trial court determined that a fiduciary relationship existed between respondents and the incompetent. Petitioner established that Dora lived with Ruth from October 1975 to September 1976; that Dora could not get around by herself and therefore depended upon Ruth and Albert; and that the bank accounts were changed to Dora and Ruth as joint tenants for Dora's convenience with the understanding that the money would be used for her expenses. Respondent Albert Brucar testified that Dora trusted him and his wife, Ruth, and that Dora gave the money to Ruth so that Ruth could take care of everything. These facts establish a prima facie case of a fiduciary relationship. (*In re Estate of Rupp* (1st Dist. 1972), 4 Ill. App. 3d 648, 281 N.E.2d 717; *In re Estate of La Rue* (1st Dist. 1964), 53 Ill. App. 2d 467, 203 N.E.2d 47.) The case is similar to *In re Estate of La Rue* in which a decedent whose estate was in issue had moved into the home of respondent, decedent's daughter, and changed her bank accounts to decedent and respondent as joint tenants in order to place the funds at respondent's disposal for decedent's convenience. The court held that a fiduciary relationship existed between the parties as to the bank accounts since respondent was to use the funds for the expenses of decedent while she was living at respondent's home. Since a fiduciary relationship was established, the burden was on respondents to show that the transactions complained of were fair and not the result of undue influence (*Tarpoff v. Karandjeff* (5th Dist. 1964), 51 Ill. App. 2d 454, 201 N.E.2d 549), and that the gifts made by the incompetent were valid. *Greig v. Johnson* (1st Dist. 1974), 22 Ill. App. 3d

646, 317 N.E.2d 627; *In re Estate of Skinner* (3d Dist. 1969), 111 Ill. App. 2d 267, 250 N.E.2d 295.

Respondents contest the trial court's order concerning several items listed in the accounting. The court ordered respondents to return to petitioner the sum of $36,850, one man's ring and several items of jewelry or $4,975, which the court determined was the value of the jewelry. Respondents contest return of the following items: (1) $10,000 claimed by Ruth as a return of her loan; (2) $375 received by Albert as penalties from Dora; (3) $3,217 said to have been given to Dora by respondents; (4) $2,993.60 received as medicare and social security benefits ·by the incompetent and unaccounted for by respondents; (5) $5,842.31 computed as interest lost when the incompetent's money was withdrawn from the certificate of deposit accounts; (6) $1,009.34 imposed as bank penalties for the early withdrawal of funds; (7) $300 paid to Milmat Carpet as an alleged gift of carpeting to respondents; (8) $214 paid to Shalom Memorial as an alleged gift of cemetery plots to respondents; and (9) $371.24 paid by respondents for medication for the incompetent. Respondents agree that they owe petitioner the sum of $1,256.72.

■■ We find that as to the first three items heretofore listed, petitioner has presented sufficient evidence to require a return of the property by respondents. Likewise with respect to the jewelry, there has been sufficient evidence to warrant the return of the diamond ring and the diamond earrings. However, with regard to the final six contested items listed above, we find that the decision of the trial court is not supported by the manifest weight of the evidence. Likewise with respect to the cameo pin, the trial court's decision is not supported by the evidence. There is no ample evidence to persuade us that these items were wrongfully withheld, and this court will not indulge in speculation.

We find also that the trial court improperly valued the jewelry. The trial court ordered respondents to turn over the jewelry or $4,975, which was the total value on the appraisal form. However, the appraisal included several pieces of jewelry belonging to respondents. Therefore, we find that respondents must turn over to petitioner the diamond ring and the diamond earrings or $2,825 which is the value of the two pieces of jewelry belonging to the incompetent.

■■ Finally, respondents filed a motion to assess petitioner-appellee for costs of compiling the excerpts. Respondents alleged that petitioner requested several immaterial documents to be included in the record and excerpts at a great expense to respondents. Petitioner alleged that the request was made to include various pleadings filed and various checks written by respondents because important facts were omitted from the excerpts as prepared by respondents. We find that it is the duty of the

appellant to prepare a complete record and complete excerpts to the reviewing court. Therefore, respondents' motion is denied.

For the above mentioned reasons, the decision of the circuit court is affirmed in part and reversed in part. Insofar as the sum of $15,648.72 plus the diamond ring and the diamond earrings or $2,825, the judgment of the circuit court is affirmed. As to all other sums, the decision of the trial court is reversed.

Affirmed in part; reversed in part.

DOWNING and BROWN, JJ., concur.